UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

INEATHA CRUZ obo
**Y. R. (minor child),**

               Plaintiff,

    v.                                      **DECISION AND ORDER**
                                               **04-CV-00290**

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

1.      Plaintiff Ineatha Cruz, on behalf of her granddaughter, Y. R., a

minor, challenges an Administrative Law Judge's ("ALJ") decision that Y. R. is

not disabled within the meaning of the Social Security Act ("the Act"). Plaintiff

alleges Y. R. has been disabled since March 30, 1995, because of a history of

speech and language delays, Attention Deficit Hyperactivity Disorder, combined

type (ADHD), bipolar I disorder, dysthymic disorder, and separation anxiety

disorder. Plaintiff alleges Y. R.'s impairments have significantly interfered with

her ability to function in an age-appropriate manner both in school and socially,

and therefore, is entitled to payment of Supplemental Security Income (SSI)

under the Act.

2.      On March 30, 1995, Y. R.'s grandmother and legal guardian,

Ineatha Cruz, filed an application for SSI benefits on behalf of Y. R. Plaintiff's

application was approved effective March 1, 1995, for disability based on speech

and language delays (R. at 57-59).[1]  Y. R.'s history of lead poisoning was noted (R. at 58).    On August 7, 1997, the Social Security Administration notified Plaintiff that Y. R.'s benefits would be terminated because of a change in the definition of disability for children mandated by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996.[2]  Plaintiff filed a Request for Reconsideration – Disability Cessation on August 26, 1997, and met with a disability hearing officer on November 24, 1997 (R. at 69, 70, 79-85).  The disability hearing officer determined Y. R.'s impairments of speech and language delays, and ADHD, although severe, did not meet or medically equal, individually or in combination, any listed impairment (R. at 84).  See 20 C.F.R. § 416.924(d); see also  20 C.F.R. § 416.926a;

http://www.ssa.gov/disability/professionals/bluebook/112.00-MentalDisorders-Childhood.htm.  Thus, on March 27, 1998, the decision to terminate Y. R.'s SSI benefits was upheld (R. at 79-85).

Plaintiff filed a timely request for a hearing before an Administrative Law Judge (ALJ) on June 3, 1998 (R. at 86).  On March 3, 1999, Plaintiff, Y. R., and a paralegal representative attended a hearing before ALJ Margaret Quinn.  ALJ Quinn issued an unfavorable decision on April 29, 1999 (R. at 24-28).  Plaintiff made a timely appeal to the Appeals Council requesting review of the ALJ's decision (R. at 321).  When Plaintiff's paralegal representative listened to the tape recording of the hearing, she discovered that the testimony of Plaintiff had not been recorded (R. at 322).  On behalf of Plaintiff, her paralegal representative

---

[1] Citations to the underlying administrative record are designated as "R."
[2] See §211(a) of Pub. L. 104-193, 110 Stat. 2105, 2188-2189 [codified at 42 U.S.C. §1382C(a)(3)(c)].

requested that the Appeals Council remand the case for a full hearing record.  Id.

The Appeals Council agreed with Plaintiff's request, and on December 7, 2001,

remanded the case to an ALJ (R. at 324-326).

Plaintiff and Y. R. appeared before ALJ J. Lawson Brown for another

hearing on February 22, 2002 (R. at 31-46, 329-332).  On September 27, 2002,

the ALJ issued an unfavorable decision upholding the termination of Y. R.'s SSI

benefits effective October 1997 (R. at 15-20).  Plaintiff requested the Appeals

Council review the ALJ's decision on November 19, 2002 (R. at 11).  On

September 2, 2003, Plaintiff's counsel submitted to the Appeals Council

additional evidence of Y. R.'s continuing disability (R. at 366-392).  The Appeals

Council denied Plaintiff's request for review on January 14, 2004 (R. at 6-10).

3.     Plaintiff filed the current civil action challenging Defendant's final

decision on March 17, 2004, requesting the Court to modify the decision of the

Defendant and grant SSI benefits to Y. R.[3]  The Defendant filed an answer to

Plaintiff's complaint on December 2, 2004, requesting dismissal of Plaintiff's

complaint.  Plaintiff submitted a Brief in support of her request for review of the

ALJ's unfavorable decision on February 1, 2005.  On April 21, 2005, Defendant

filed a Motion for Remand of the matter to the Commissioner for further

administrative proceedings, and a Memorandum of Law in Support of the

Commissioner's Motion for Remand.  Plaintiff filed an Opposition to Defendant's

Motion for Remand on May 16, 2005, asserting the appropriate remedy to be an

award of benefits rather than further administrative proceedings.   After full

---

[3] The ALJ's September 27, 2002 decision became the Commissioner's final decision in this case when the
Appeals Council denied Plaintiff's request for review.

briefing, the Court deemed oral argument unnecessary and took the motions under submission.[4]  For the following reasons, Defendant's motion for remand for further administrative proceedings is denied, and this case is remanded for a calculation of benefits.

4.     A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. § 405(g), 1383 (c)(3); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

5.     "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Williams on

---

[4] Although no motion for judgment on the pleadings was filed in this matter by either party, both parties are excused from such filing under Northern District General Order No. 18, which states in part: "The Magistrate Judge will treat the proceedings as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review."  Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6.     On August 22, 1996, Congress enacted the Personal Responsibility and Work Opportunity and Reconciliation Act of 1996 (1996 Act), which amended the statutory standard for children seeking SSI benefits.  See 42 U.S.C. § 1382c. In relevant part, the 1996 Act provides that an "individual under the age of 18 shall be considered disabled…if [he or she] has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." See 42 U.S.C. § 1382c(a)(3)(C)(i).

7.     The regulations promulgated by the Social Security Administration (SSA) define "marked and severe functional limitations" in terms of "listing-level severity," *i.e.*, an impairment that meets, medically equals or functionally equals the severity of an impairment in the listings.  See 20 C.F.R. § 416.926a(a).  In accordance with the regulations, a child's functional limitations are evaluated in

six broad areas or domains of functioning: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself [oneself]; and (vi) health and physical well-being.  See 20 C.F.R  § 416.926a(b).

8.      The Commissioner has established a three-step sequential evaluation process to determine whether a child is disabled as defined under the Act.  See 20 C.F.R. § 416.924.  Specifically, the child must demonstrate: (1) that he or she is not working; (2) that he or she has a "severe" impairment or combination or impairments; and (3) that his or her impairment or combination of impairments is of listing level severity in that it meets, medically equals or functionally equals the severity of a listed impairment.  See 20 C.F.R. § 416.924. A child's medically determinable impairment or combination of impairments "functionally equals" a listed impairment if it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  See 20 C.F.R. 416.926(a).  A limitation is "marked" if it seriously interferes with a claimant's ability to independently initiate, sustain, or complete activities.  See 20 C.F.R. §416.926a(e)(2). A "marked" limitation is more than moderate but less than extreme. See id.

9.      Applying the sequential evaluation in the instant case, the ALJ made the following findings: (1) Y. R. has not engaged in substantial gainful activity at any time pertinent to this decision (20 C.F.R. 416.924(b)); (2) Y. R. has an attention deficit hyperactivity disorder, oppositional defiant disorder, and learning disorder which are considered severe (20 C.F.R. 416.924(c)); (3) Y. R.'s

impairment does not meet or medically equal the requirements of listing in the *Listing of Impairment* in Appendix 1, Subpart P, Regulations No. 4 (20 C.F.R. 416.924(d)); (4) The testimony at the hearing was credible; (5) The evidence establishes functional limitations resulting from the combined effects of all the Y. R.'s impairments and reasonably related symptoms of less than marked impairment in the following domains: Y. R.'s ability to acquire and use information, interact and relate appropriately with others, maintain concentration and attention, with no other functional limitations in the remaining domains; (6) the severity of Y. R.'s impairment does not functionally equal the criteria of any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4 (20 C.F.R. 416.924(d); and (7) Y. R. has not been under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. 416.924(d)).  Accordingly, the ALJ determined Y. R.'s eligibility for supplemental security income payments ended effective October 1, 1997.

10.    Plaintiff challenges the Commissioner's determination that Y. R. is not disabled and asserts the ALJ's decision is not supported by the substantial evidence of record.  Specifically, Plaintiff alleges that (1) the Appeals Council erred by failing to consider additional evidence submitted by Plaintiff after the date of the ALJ's decision, but before the notification to Plaintiff that the Appeals Council denied review of the ALJ's decision, (2) the Commissioner erred by failing to find that Y. R.'s impairments met, or medically equaled a Listing, and (3) the Commissioner erred by failing to find that Y. R.'s impairments functionally

equaled a Listing.  Each of Plaintiff's allegations will be addressed in sequence by the Court.

11.     Plaintiff's first challenge to the Commissioner's decision is that the Appeals Council erred by not considering additional evidence submitted by Plaintiff after the ALJ issued his decision upholding the termination of Y. R.'s SSI benefits, but prior to the Appeals Council's notification to Plaintiff that it had denied her request for review.  Plaintiff points out that under 20 C.F.R. § 416.1470, the rules that guide the Appeals Council when new and material evidence is submitted differ when a matter is other than an application for benefits.  ("In reviewing decisions other than those based on an application for benefits, the Appeals Council shall evaluate the entire record including any new and material evidence submitted.  It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.")  See 20 C.F.R. § 416.1470(b).

In this matter, Plaintiff's appeal is based on *termination* of Y. R.'s SSI benefits, rather than on an *application* for benefits.  Thus, the Appeals Council was required to consider the new and material evidence submitted by Plaintiff to the Council, even though the evidence pertained to a time period after the ALJ's decision.  The letter of the Appeals Council to Plaintiff notifying her that it denied her request for review states, "In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of the Appeals Council.  We found that this information does not provide a basis for changing the Administrative Law Judge's decision" (R. at 6-7).

The next paragraph states, "The Administrative Law Judge ruled on the issue of disability in your case only through September 27, 2002, the date of the decision. If you wish to receive a determination on the issue of disability after that date, you will need to file a new application" (R. at 7).

The Appeals Council was required to review Plaintiff's case only if, after *evaluating* the entire record, including any *new and material evidence* submitted, the Council found the "administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record."  See 20 C.F.R. § 416.1470(b). [Emphasis supplied].  From the cursory statement provided to Plaintiff in the Notice of Appeals Council Action, it is not possible to determine how the Appeals Council evaluated Plaintiff's new evidence, and the weight it attached to this evidence, (R. at 6-8). For example, the Court cannot determine from the Appeals Council denial whether the Appeals Council considered Plaintiff's record closed as of the day the ALJ issued his decision, which would have been clear error, or an analyst evaluated the evidence and found it new but not material, or an analyst evaluated the evidence and found it both new and material, but under the weight of the evidence rule, found the new and material evidence not of sufficient weight to disturb the ALJ's decision.

Guidance is given to the Appeals Council for handling evidence submitted after an ALJ's decision is issued in HALLEX, the Hearing, Appeals, and Litigation Manual published on-line by the Social Security Administration's Office of Disability Adjudication and Review.  See http://www.ssa.gov/OP_Home/hallex.html.  In general, "When a claimant or

representative submits additional evidence, it must be both new and material to warrant the Appeals Council's consideration.  Evidence is new when it is not duplicative, cumulative or repetitive…When new and material evidence has been submitted with a request for review, the analyst will apply the weight of the evidence rule instead of the substantial evidence rule in deciding whether to recommend review action to the Appeals Council."  See http://www.ssa.gov/OP_Home/hallex/I-03/I-3-3-6.html.  In its fiscal year 2005 Performance and Accountability Report, the Social Security Administration explained its view of the difference between substantial evidence and weight of evidence by stating, "Substantial evidence is defined as evidence, which, although less than a preponderance, nevertheless is sufficient to convince a reasonable mind of the credibility of a position taken on an issue, when no evidence on the opposing side clearly compels another finding or conclusion.  The 'substantial evidence rule' requires less in support of a finding or conclusion than the 'weight of evidence rule.'  Evidence on one side of an issue need not possess greater weight or be more convincing and credible to be 'substantial.'"  See SSA's FY 2005 Performance and Accountability Report, p. 76.

When new evidence is submitted to the Appeals Council with a request to review an ALJ's decision, an Appeals Council analyst must determine if the evidence is: (a) both new and material, (b) new, but not material, or (c) neither new nor material.  See http://www.ssa.gov/OP_Home/hallex/I-03/I-3-5-20.html. The analyst must also determine if a claimant's record is "closed" for the purpose of consideration of new and material evidence.  Id. In the instant case, Y. R.'s

record was not "closed" for the purpose of consideration of new and material evidence pertaining to the time frame after the ALJ's decision, as her claim was based on cessation of benefits under Title XVI, as opposed to a denial of benefits.  See http://www.ssa.gov/OP_Home/hallex/I-03/I-3-3-6.html.

In a memorandum dated July 20, 1995, the Social Security Administration temporarily suspended for 60 days its "requirement for a detailed discussion of additional evidence and for specific responses to contentions in denial notices." See http://www.ssa.gov/OP_Home/hallex/I-03/I-3-5-90.html.  While this temporary suspension did not "lessen the analyst's responsibility to consider the evidence and contentions and to make an appropriate recommendation to the Administrative Appeals Judge," it did suspend the requirement for a detailed discussion of additional evidence and specific responses to contentions in denial notices."  Id.  This new procedure was to remain in effect for approximately 60 days to determine its effect on Appeals Council productivity, and to obtain feedback from interested parties.  Id. Until September 8, 2005, there appears to be no record available to either the Court or the public of the reauthorization of this procedure after the expiration of the 60-day period.

Eventually, on September 8, 2005, HALLEX was updated to reflect the procedure for an appropriate response to both additional evidence and legal arguments or contentions submitted in connection with any request for review of an ALJ's decision.  See http://www.ssa.gov/OP_Home/hallex/I-03-1-3-5-30.html. The new guidelines provided that, "When a claimant or representative makes a specific argument or contention or raises a question or issue which is pertinent to

the matter[s] before the Appeals Council in a request for review, the analyst must draft responsive language in the response.  For example: 'In reaching this conclusion, the Appeals Council considered your attorney's contention that…The Administrative Law Judge discussed…in his decision (see pages 4 and 5 of the ALJ hearing decision).  He considered…and found…'."  Id.

However, because the Appeals Council denied Plaintiff's request for review of the ALJ's decision on January 14, 2004, it did so under the 1995 guidelines, which were in effect at the time of its decision. Although the court cannot determine why the temporary 60-day guidelines were left in effect for 10 years without any apparent appropriate administrative renewal, it is of no import. The Court finds the Appeals Council's response inadequate (R. at 6-8).  See http://www.ssa.gov/OP_Home/hallex/I-03/I-3-5-90.html.  It is not possible for the Court to effectively analyze the Appeals Council reasoning in considering Y. R.'s new and relevant evidence, because it failed to explain under any standard what reasoning it employed in reaching its decision.

Contrary to the Appeals Council's implied findings utilized in rejecting Plaintiff's appeal, the Court finds Plaintiff's new and material evidence compelling because it strongly suggests further examination of Y. R. should have been undertaken immediately after State agency examining psychologist, Dr. Seltenreich, issued his evaluation, and before the ALJ issued his decision (R. at 15-20, 353-364).  During the hearing before ALJ Brown, the ALJ told Plaintiff on three occasions, "I'm going to send her to a psychologist and then we're going to send her to a psychiatrist," followed by, "Psychologist first and then psychiatrist

second," followed by, "We'll send her to a psychologist, and to a psychiatrist, and let's find out what's going on" (R. at 42, 43, and 45).  Yet a consultative examination of Y. R. by a State agency psychiatrist appears to have not been undertaken because there is no record of it ever having taken place.

In his written report, Dr. Seltenreich raised questions and red flags that clearly merited additional examination by a psychiatrist. As an example, the doctor noted, "I would follow her closely for the possible consideration of her having a bipolar illness…The claimant might also benefit from some type of neurological workup to see if there are any ongoing brain-related events that contribute to her difficulty" (R. at 356).  When he conducted a Personality and Organicity Evaluation of Y. R., Dr. Seltenreich reported,

> The Bender Visual Motor Gestalt Test was administered in order to ascertain a gross estimate of the claimant's ability to integrate perceptual and motor functions.  Utilization of the Lacks scoring methodology yielded a total distortion score of 6.  The claimant evidenced distortions of simplification, overlapping difficulty, closure difficulty, retrogression, perseveration and rotation.  According to the present scoring system, the presence of five or more distortions is indicative of a significant organic deficit in perceptual-motor integrative functioning.  The claimant's performance is suggestive of impairment within the domain of perceptual-motor integrative functioning.

(R. at 360-361).  Further, in his medical source statement, Dr. Seltenreich opined,

> The claimant has problems attending to, following, and understanding age-appropriate directions, completing age-appropriate tasks, and maintaining appropriate social behavior…She is not well-aware of danger and the need to take precautions.  She has problems interacting with peers and a lot of problems interacting with adults.  The examination results are consistent with the allegations of mental health difficulties" (R. at 361).  Dr. Seltenreich's prognosis for Y. R. was, "guarded at this time given the multiple difficulties she is experiencing.

(R. at 362). The Court cannot know precisely how Y. R.'s case would have concluded had further examination of Y. R. been undertaken within a reasonable time frame after Dr. Seltenreich completed his evaluation.  However, Plaintiff's new and material evidence submitted to the Appeals Council in the time frame after the ALJ issued his decision, but before the Appeals Council denied review, reflects that Y. R. had continuing serious mental health problems that were very apparent at the time of the ALJ's decision (R. at 366-391).   The ALJ noted that Y. R.'s diagnoses included "an attention deficit disorder, sleep disorder, conduct disorder, reading disorder, rule-out bipolar disorder" (R. at 18).  By the time Plaintiff submitted her new and material evidence, bipolar disorder had been ruled in (R. at 378, 380, 385).

        In his decision, the ALJ discussed Y. R.'s medications twice, stating, "It was noted that she is not currently receiving any mental health treatment and was prescribed medications from her pediatrician," and, "The claimant is diagnosed with an attention deficit hyperactivity disorder and is prescribed medication by her pediatrician.  Her teacher had indicated that sometimes she has difficulty staying on task when not medicated" (R. at 17, 18).  The ALJ did not discuss in his decision the notations in Y. R.'s record of the difficulties her physicians experienced in finding the right medications and dosages that would allow her to function adequately during the day and sleep at night (R. at 275, 277, 279-284, 335).  In Plaintiff's new and relevant evidence submitted to the Appeals Council after the ALJ's decision, Y. R.'s psychiatrist noted he changed her medications again on at least two occasions (R. at 374, 387, 389, 390-391).

Also included in Plaintiff's new and relevant evidence was the recommendation by Y. R.'s clinical social worker that Y. R.'s "grandmother has been encouraged to place [Y. R.] on a PINS/Ungovernable petition.  Though probation may not be effective in changing [Y. R.'s] behaviors, it will provide a doorway to a higher level of placement should [Y. R.] continue to be disruptive and unable to follow safety rules, which it appears likely at this point" (R. at 387).  Dr. Seltenreich clearly expressed concern about Y. R.'s ability to conduct herself in an age-appropriate manner when he opined, "She has problems interacting with peers and a lot of problems interacting with adults" (R. at 361).

Plaintiff also presented new and relevant evidence that Y. R.'s Global Assessment of Functioning (GAF) score deteriorated during the time frames both prior to the ALJ's decision, and after the ALJ's decision but prior to the time the Appeals Council declined review.[5]  In June 1997, Plaintiff's GAF score, as assessed by her psychiatrist, was 60, suggesting she exhibited, "Variable functioning with sporadic difficulties or symptoms in several but not all social areas; disturbance would be apparent to those who encounter the child in a dysfunctional setting or time but not to those who see the child in other settings" (R. at 261).  See DSM-IV-TR.  By August 1998, Plaintiff's psychiatrist scored her at 50 on the CGAS, suggesting she exhibited a "Moderate degree of interference in functioning in most social areas or severe impairment of functioning in one area, such as might result from, for example, suicidal preoccupations and

---

[5] The Global Assessment of Functioning (GAF) is a numeric scale (0-100) used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults.  The general functioning of children under the age of 18 is rated on the CGAS scale.  The scales are presented and described in DSM-IV-TR.

ruminations, school refusal and other forms of anxiety, obsessive rituals, major conversion symptoms, frequent anxiety attacks, poor to inappropriate social skills, frequent episodes of aggressive or other antisocial behavior with some preservation of meaningful social relationships" (R. at 343).  Id.  In November 2002, and in March 2003, Plaintiff's psychiatrist assessed her on the CGAS at 45, suggesting a further, although not precipitous, decline in her general ability to function adequately (R. at 373, 379).

Plaintiff's new evidence clearly relates to the time frame of Plaintiff's claim and does not reflect a manifestation of a new ailment developed by Y. R. after the ALJ issued his decision.  If this were the only issue in this case, the Court would remand the matter to the Commissioner for further administrative proceedings.  However, as discussed below, further administrative proceedings would not be in the interests of justice.

12.     Plaintiff's second challenge to the ALJ's decision is that the ALJ erred by failing to find that Y.R.'s impairments met, or medically equaled, a listed impairment as set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, §112.00A, and summarily did so without citing evidence or giving an explanation for his conclusion. The Court agrees. The ALJ credited Plaintiff with having ADHD, oppositional defiant disorder, and a learning disorder; all impairments that are considered severe (R. at 19).  However, in his decision the ALJ neglected to fully examine the diagnosis of State agency consulting psychologist Dr. Seltenreich, who opined Plaintiff had, "Attention deficit hyperactivity disorder – combined" (R.

at 356).  This impairment is included in the listings at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.11.

From his decision, the Court struggles to .012deduce what factors the ALJ may have considered when he determined Y.R.'s impairments, including her diagnosed ADHD – combined type, were not disabling; but the Court should not have to guess.  When a disability claimant asserts that he or she has an impairment that is included in the listings at 20 C.F.R. Part 404, Subpart P, Appendix 1, the Commissioner must provide sufficient and specific reasons either accepting or rejecting the claimant's assertions.  See Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982).  ("Thus, in future cases in which the disability claim is premised upon one or more listed impairments of Appendix 1, the Secretary should set forth a sufficient rationale in support of his decision to find or not find a listed impairment.")   Id.

The ALJ was required to provide a thorough examination of Plaintiff's evidence, including the medical opinion of State agency psychologist Dr. Seltenreich, to determine if Y.R.'s impairments met or medically equaled a listed impairment in 20 CF.R. Part 4, Subpart P, Appendix 1., and upon that determination, to provide sufficient and specific reasons in support of her decision to find, or not find, a listed impairment.  Thus, the failure of the ALJ to provide any rationale whatsoever of his decision to discount Y. R.'s diagnosis of ADHD-Combined as a listed impairment, is error.

As in section 11 above, ordinarily the Court would have been inclined to remand this matter to the Commissioner for further administrative proceedings.

However, such action would neither be a fair and equitable outcome to Plaintiff's complaint, nor would it be in the interests of justice given the third challenge to the ALJ's decision.

13.     Plaintiff's third challenge to the ALJ's decision is that the ALJ erred by failing to find that *Y.R.'s* impairments functionally equaled a listed impairment at 20 C.F.R. Part 4, Subpart P, Appendix 1, §112.00A.  Impairments that do not meet or medically equal a listed impairment still may be found to be functionally equivalent to a listed impairment.  See 20 C.F.R. § 416.926a(a).  As discussed in Paragraph 7 above, to determine if a child is functionally impaired, his or her impairments are evaluated in six broad areas or domains of functioning including (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being.  See 20 C.F.R. § 416.926a(b).  For a child's impairment, or combination of impairments, to be found functionally equivalent to a listed impairment, the child must exhibit marked limitation in at least two broad areas, or domains, of function, or an extreme limitation in one domain of function.  Id.  Plaintiff alleges Y.R. has marked limitations in four of the six broad areas of functioning, and thus her impairments functionally equal a listed impairment.

First, Plaintiff claims Y.R. has a marked impairment in the domain of "acquiring and using information."  Plaintiff points out Y.R. was diagnosed with lead poisoning as a small child and exhibited high lead levels in her blood for several years, and this exposure to lead has impacted her ability to learn (R. at

58, 170, 172).  She has been a special education student since she was three

years old, and continues to need special education, as she consistently functions

below grade level (R. at 167-169, 172-174, 175-177, 178-181, 182-204, 230-231,

234-235, 236-238, 240-253).  Plaintiff notes both State agency examining

psychologists who examined and tested Y.R. remarked on her cognitive defects

and how her ADHD negatively impacted her ability to function in school (R. at

198-199, 355-356).

Second, Plaintiff claims Y.R. has a marked limitation in the domain of

"attending and completing tasks."  Plaintiff notes that even with the

accommodation of being in a special education program, Y.R. still needs extra

help and reminders from her teachers.  Plaintiff points to evidence in Y.R.'s

record that shows she fails to complete activities, cannot stay on track when she

engages in activities, interrupts others, becomes frustrated and easily gives up

on tasks, and requires extra supervision to keep her on task (R. at 183, 204, 232,

248, 296, 300, 358).

Third, Plaintiff claims Y.R. has a marked limitation in the domain of

"interacting with and relating to others."  Plaintiff points to numerous references in

Y.R.'s record of angry and aggressive behavior, failure to accept criticism, and

failure to get along with peers and adults (R. at 210, 255, 295, 300, 312, 355).

She is described by adults who have known and worked with her as belligerent,

oppositional, angry, violent, and defiant (R. at 255, 315, 339).  She was placed

on out-of-school suspension for attempting to pull down the pants of a young boy

(R. at 375).  A State agency examining psychologist stated in his report that Y.R.

had difficulty maintaining age-appropriate social behavior (R. at 355).  Plaintiff

notes Y.R.'s CGAS score, which assesses her general ability to function, has

dropped from 60 to 45, suggesting she has a moderate degree of interference in

functioning in most social areas, or severe impairment of functioning in one area

(R. at 261, 343, 373, 379).  (See Section 11 above for a discussion of CGAS.)

Fourth, Plaintiff claims Y.R. has a marked limitation in the domain of

"caring for [oneself]." [6]  Plaintiff's evidence shows Y.R. has engaged in reckless,

risky, and sexually inappropriate conduct, such as leaving the school building

without permission, wandering in her neighborhood, getting into cars with adult

men who are strangers, being alone with adult men who are strangers, and

stealing (R. at 234-235, 340, 355, 373, 275, 391).  Psychological testing

completed by State agency examining psychologist Dr. Seltenreich, in April 2002,

showed Y.R. was impulsive, indifferent to social norms, attention-seeking, and

without the inability to weigh the consequences of her own actions (R. at 361).

14.     It is clear the ALJ assessed Y.R.'s limitations in the domain of

"acquiring and using information."  As an example, the ALJ found:

> …claimant has a less than marked impairment in her ability to acquire and
> use information.  It is noted the claimant's IQ scores are within the
> average range and most likely a low estimate of her ability since the
> psychologist observed that the claimant's style of responding was
> inconsistent in that it varied from careless to careful.  It is also noted that
> the claimant was below age expectations with regard to reading, writing
> and to a lesser degree arithmetic given her average IQ scores and is
> struggling in school (R. at 18).

However, the ALJ judged Y.R.'s functioning as less than marked in this domain.

Id.

---

[6] "Caring for yourself," as it is listed in the rule, means following safety rules and avoiding unsafe
behavior.  See 20 C.F.R. § 416.926a(k)(l)(iv).

Further, the ALJ assessed Plaintiff's allegations that Y.R. had a marked limitation in the domain of "attending and completing tasks."  While the ALJ referred to this domain as "ability to maintain concentration and persistence," he noted her teacher indicated that she sometimes has difficulty staying on task "when not medicated" (R. at 18).  The ALJ also found that "at times [Y.R.] is defiant in refusing to perform tasks, but does understand the assignments given" (R. at 18, 296-297).

Within the domain of "interacting and relating to others," the ALJ found Y.R. had less than a marked limitation (R. at 18).  In support of his determination, the ALJ noted, "The claimant has a difficult time relating with adults and to lesser degree peers, since she does have some friends.  The claimant's pediatrician reported that claimant's behavior is variable that she can be quiet and well-behaved in his office and there is no indication she has had any school suspensions" (R. at 18).

Within the domain of "moving about and manipulating objects," the ALJ assessed Y.R. had no limitations, and within the domain of "physical health and well-being," the ALJ noted there was no evidence to suggest Y.R. had an impairment (R. at 19).  Finally, the ALJ failed to assess Y.R. within the domain of "caring for [oneself]."  Id.

15.     It is the sole responsibility of the ALJ to weigh all the medical and other evidence and resolve any material conflicts in the record.  See Richardson v. Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426, 28 L. Ed. 2d 842 (1971).  In

other words, an ALJ may afford more or less weight to a medical or other opinion contained in a record depending on its consistency with the entire record.

With respect to the ALJ's opinion on Y.R.'s ability to "use and acquire knowledge," the ALJ supported his opinion with evidence of Y.R.'s intellectual functioning assessments performed by the State agency examining psychologist approximately five months before the ALJ rendered his decision (R. at 18).  The ALJ noted the psychologist found Y. R.'s "speech was fluent with good overall intelligibility and appropriate expressive and receptive language skills.  Her thought processes were coherent and goal directed with no evidence of a thought disorder."  Id.  The ALJ noted Y. R. was struggling in school and was below age expectations in reading, writing, and arithmetic, but concluded she had a "less than marked" impairment of her ability to acquire and use information given her normal IQ scores.  Id.

With respect to Plaintiff's ability to function in the domain of "attending and completing tasks," the ALJ noted Y.R.'s physicians had diagnosed ADHD, but that her teacher reported she "sometimes has difficulty staying on task when not medicated."  Id.  The ALJ also noted Y.R.'s teacher reported she was defiant in refusing to perform tasks but does understand the assignments given.  Id.  In making his assessment of Y. R.'s functioning in this domain, the ALJ relied on comments within the record by Y. R.'s physicians, who noted at various visits for medication review, "Teacher sees improvement in attention span and performance," "Teacher note shows improvement," "Mother reports behavior good," grades "A's, B's, and C's in last report," "Doing very well at school and

home," "Reading level increases," and "Able to do homework better alone" (R. at 272, 274, 276, 277, 278).

Thus, within the domains of "acquiring and using knowledge," and "attending to and completing tasks," the Court finds the ALJ relied upon substantial evidence in making his determination that Plaintiff suffered from less than a marked impairment in either of these two domains.  This does not mean that substantial evidence contained in the record did not support Plaintiff's position that Y. R. has significant limitations in these two domains.  However, when an ALJ's finding is supported by substantial evidence, that finding must be sustained, even though the Court might have justifiably reached a different conclusion upon *de* novo review.  See Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992); Valente v. Sec'y of Health & Human Servs., 733 F. 2d 1037, 1041 (2d Cir. 1984).

Also, there is simply no evidence in the record to suggest that Y.R. had any limitation in the domain of "moving about or manipulating objects," or a limitation in the domain of "physical health or well-being."  Therefore, the ALJ was correct in assessing that Plaintiff had no impairment in these two domains.

16.     Within the domain of "interacting with and relating to others," the ALJ found Y.R. had less than a marked impairment, and noted in his decision, "The claimant has a difficult time relating with adults and to lesser degree peers, since she does have some friends.  The claimant's pediatrician has reported that the claimant's behavior is variable that she can be quiet and well behaved in his office and there is no indication that she has had any school suspensions" (R. at

18).  However, the Court notes Plaintiff's record is replete with evidence that she

has at least a marked impairment of her ability to interact with and relate to

others.

The regulations at 20 C.F.R. § 416.926a(i) require that this domain be

evaluated in the following manner:

> Interacting and relating with others.  In this domain, we
> consider how well you initiate and sustain emotional
> connections with others, develop and use the language
> of your community, cooperate with others, comply with rules,
> respond to criticism, and respect and take care of the
> possessions of others.

> (1)  General.
>     (i)     Interacting means initiating and responding to exchanges
>             with other people, for practical or social purposes.  You
>             may interact with others by using facial expressions,
>             gestures, actions, or words.  You may interact with
>             another person only once, as when asking a stranger for
>             directions, or many times, as when describing you day at
>             school to your parents.  You may interact with people
>             one-at-a-time, as when you are listening to another
>             student in the hallway at school, or in groups, as when
>             you are playing with others.
>     (ii)    Relating to other people means forming intimate
>             relationships with family members and with friends who
>             are your age, and sustaining them over time.  You may
>             relate to individuals, such as your siblings, parents or
>             best friend, or to groups, such as other children in
>             childcare, your friends in school, teammates in sports
>             activities, or people in your neighborhood.
>     (iii)   Interacting and relating require you to respond
>             appropriately to a variety of emotional and behavioral
>             cues.  You must be able to speak intelligibly and fluently
>             so that others can understand you; participate in verbal
>             turntaking and nonverbal exchanges; consider others'
>             feelings and points of view; follow social rules for
>             interaction and conversation; and respond to others
>             appropriately and meaningfully.
>     (iv)    Your activities at home or school or in your community
>             may involve playing, learning, and working cooperatively
>             with other children, one-at-a-time or in groups; joining

voluntarily in activities with the other children in your school or community; and responding to persons in authority (e.g., your parent, teacher, bus driver, coach, or employer).

(2) Age group descriptors –
…
(v)   School-age children (age 6 to attainment of age 12). When you enter school, you should be able to develop more lasting friendships with children who are your own age.  You should begin to understand how to work in groups to create projects and solve problems.  You should have an increasing ability to understand another's point of view and to tolerate differences.  You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

(vi)  Adolescents (age 12 to attainment of age 18).  By the time you reach adolescence, you should be able to initiate and develop friendships with children who are your age and to relate appropriately to other children and adults, both individually and in groups.  You should recognize that there are different social rules for you and your friends and for acquaintances or adults.  You should be able to intelligibly express your feelings, ask for assistance in getting your needs met, seek information, describe events, and tell stories in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers).

(3)  Examples of limited functioning in interacting and relating with others.  The following examples describe some limitations we may consider in this domain.  Your limitations may be different from the ones listed here.  Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one.  As in any case, your limitations must result from your medically determinable impairment(s).  However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) result in a "marked" or "extreme" limitation in this domain.

(i)    You do not reach out to be picked up and held by your
        caregiver
(ii)   You have no close friends, or your friends are all older or
        younger than you.
(iii)  You avoid or withdraw from people you know, or are
        overly anxious or fearful of trying new experiences.
(iv)   You have difficulty playing games or sports with rules.
(v)    You have difficulty communicating with others; e.g., in
        using verbal and non-verbal skills to express yourself,
        carrying on a conversation, or in asking others for
        assistance.
(vi)   You have difficulty speaking intelligibly or with adequate
        fluency.

Evidence in the record, most of which the ALJ did not discuss in his

decision, supports a finding that Y. R. has a marked limitation in this domain.

Much of the evidence is discussed in Section 11 above, but as further support for

this conclusion, Y.R.'s teacher completed an Attention Deficit Disorder Screen in

November 1997 (R. at 243).  The teacher recorded Y.R. showed symptoms of

having difficulty waiting for her turn in a group, having difficulty following

instructions from others, talking excessively, interrupting or intruding on others,

and often does not listen to what is said.  Id.   On May 20, 1998, Y.R. (who was

then approximately six and one-half years old) was reported by her teacher to be

running around her classroom, knocking things over, and yelling (R. at 232).

When the teacher called the office for assistance with Y.R., she tried to crawl out

an open window.  Id.  When the principal arrived to assist Y.R.'s teacher, Y.R.

bolted out the classroom door (R. at 233).  The next day, May 21, 1998, Y.R. was

taken to her school's health center because "her behavior was out of control" (R.

at 230).  When Y.R. was asked by the school nurse to sit down, the nurse

reported Y.R. called her a "f----g b----h," and Y.R. told the nurse she was going to

26

"f--k my a-s."[7]  Id.  The school administration called for Y.R.'s grandmother to come to the school to pick her up, and while waiting, the nurse reported Y.R. continued to yell obscenities whenever she was addressed, or to entertain other students who came to the health office for various problems (R. at 231).

On August 12, 1998, Y.R. and her grandmother were discharged from Parsons Child and Family Center for "lack of progress" (R. at 339-345).  The discharge report noted Y.R. "continues to exhibit severe defiance at times, also sexually inappropriate behavior" (R. at 342).  On December 10, 1998, Y.R.'s teachers completed a questionnaire for the Social Security Administration wherein they assessed Y.R. as behaving socially in an age-appropriate manner only "sometimes," and noted that she was "somewhat aggressive towards peers" (R. at 295).  State agency examining psychologist Dr. Seltenreich opined in his medical source statement, "The claimant has problems attending to, following, and understanding age-appropriate directions, completing age-appropriate tasks, and maintaining appropriate social behavior…She does not always ask questions or request assistance when necessary in an age-appropriate manner…She has problems interacting with peers and a lot of problems interacting with adults" (R. at 355).

In late 2002, Y. R. and her ten-year-old sister tried to pull down the pants of a boy at school (R. at 375).  Y. R. was placed on out of school suspension, and had to attend the school district's "tough love" program before being re-admitted to her school in early 2003.  Id.

---

[7] The masking of profanity accurately reflects teacher's written report.

The above is but a sample of the plethora of evidence in Y. R.'s record that shows she has at the very least a marked impairment in the domain of "interacting with and relating to others."  Thus, the Court finds the ALJ did not base his assessment of Plaintiff's functioning in this domain on the substantial evidence of record.

17.    Further, the ALJ did not assess whatsoever Plaintiff's functioning in the "caring for [oneself]" domain (R. at 15-20).  The Commissioner acknowledges the ALJ's decision was deficient in this area and has requested the matter be remanded for further administrative proceedings, as, "there are occasions in which it appears Y. R. may be limited in this area."  See Defendant's Memorandum of Law in Support of The Commissioner's Motion for Remand, p. 3.

The regulations at 20 C.F.R. § 416.926a(k) require that this domain be evaluated in the following manner:

> Caring for yourself.  In this domain, we consider how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how well you cope with stress and changes in your  environment; whether you take care of your own health, possessions, and living area.
>
> (1)  General.
>
>> (i)    Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health, and safety. It is characterized by a sense of independence and competence.  The effort to become independent and competent should be observable throughout your childhood.

28

(ii)    Caring for yourself effectively means becoming increasingly independent in making and following your own decisions.  This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself.  As you mature, using and testing your own judgment helps you develop confidence in your independence and competence. Caring for yourself includes using your independence and competence to meet your physical  needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.

(iii)    Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and all of your physical and emotional needs.  To meet these needs successfully, you must employ successful coping strategies, appropriate to your age, to identify and regulate your feelings, thought, urges, and intentions.  Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.

(iv)    Caring for yourself mean recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask others for help.

(2) Age group descriptors –-
…

(iv)    School age children (age 6 to attainment of age 12). You should be independent in most of your day-to –day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely.  You should begin to recognize that you are competent in doing some activities and that you have difficulty with others.  You should be able to identify those circumstances when you feel good about yourself and when you feel bad.  You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior.  You should begin to demonstrate consistent control over your behavior, and you should avoid behaviors that are unsafe or otherwise not good for you.  You should begin to imitate more of the behavior of adults you know.

(v)    Adolescents (age 12 to attainment of age 18).  You should feel more independent from others and should be

increasingly independent in all your day-to-day activities. You may sometimes experience confusion in the way you feel about yourself. You should begin to notice significant changes in your body's development, and this can result in anxiety or worrying about yourself and your body. Sometimes these worries can make you feel angry or frustrated. You should begin to discover appropriate ways to express your feeling, both good and bad (e.g., keeping a diary to sort out angry feelings or listening to music to calm yourself down). You should begin to think seriously about your future plans and what you will do when you finish school.

(3) Examples of limited functioning in caring for yourself. The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here. Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not in a younger one. As in any case, your limitations must result from your medically determinable impairment(s). However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) results in a "marked" or "extreme" limitation in this domain.

(i)     you continue to place non-nutritive or inedible objects in your mouth
(ii)    You often use self-soothing activities showing developmental regression (e.g., thumb-sucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).
(iii)   You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.
(iv)    You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, refusal to take your medication), or you ignore safety rules.
(v)     You do not spontaneously pursue enjoyable activities or interests.
(vi)    You have disturbance in eating or sleeping patterns.

The record reveals Y. R. has at the very least a marked limitation this domain.  Much of the conduct exhibited by Y. R. and discussed above in the domain of "interacting and relating with others," touches on the domain of "caring for [oneself]."  As an example, in the incident on May 20, 1998, when Y. R. was reported by her teacher to be running around the classroom, knocking things over, and yelling, Y. R. attempted to crawl out an open window while the teacher called for assistance (R. at 232).  When Y. R. and Plaintiff were discharged from Parsons Child and Family Center for "lack of progress," the social worker noted:

> [Y. R.] added some symptoms during the course of treatment: persistent unsafe play on the stairway behind their second-story apartment, running off down the street, jumping up and down until her ankles hurt, and persistent fighting with her younger sister, [N. R.]…[Y. R.'s] sexual inappropriateness persisted in mild form and then worsened toward the end, to include caressing boys her age in the hallway and contriving to be alone with men in the neighborhood.  She has shown distinct signs of flirting during therapy sessions…Guardian made much of an incident in 11/97 in which two boys in her class got on top of her in school and pulled up her dress.  The exact extent of the sex play and the role [Y. R.] played were never determined (R. at 340).

Additional examples of Y. R. marked impairment in this domain abound in the record.  In a May 6, 1998, incident report to the School Superintendent from the Co-Principal of the school Y. R. attended, the Co-Principal noted Y. R. had been "labeled emotionally disturbed" (R. at 234).  The Co-Principal then related an incident that occurred the day before when Y. R. left the classroom while the teacher was at the chalkboard.  Id.  Other students alerted the teacher to Y. R.'s disappearance, and a search of the school and surrounding area was undertaken (R. at 234-235).  Y. R. was returned to the school by a crossing guard sometime

after she had purchased a bottle of orange juice in a local store, and when questioned about who brought her back to school, she told school officials her father had brought her back (R. at 235).  Y. R.'s grandmother arrived at the school after the incident and reported that Y. R. knew her father was in jail.  Id.

State agency psychologist Dr. Seltenreich noted in his examination of Y. R. that "her insight was limited," "her judgment appeared to be quite poor due to her impulsivity," and "she is not well-aware of danger and the need to take precautions" (R. at 355).

Contained within Plaintiff's new and relevant evidence submitted on behalf of Y.R. to the Appeals Council after the date of the ALJ's decision is a summary of Plaintiff's interview with consulting psychiatrist Dr. Passen in March 2003.  Plaintiff, who is Y.R.'s grandmother, reported to Dr. Passen Y. R.'s long history of difficulties involving sexual activity.  The grandmother discussed with the doctor an incident that occurred five or six months earlier, when a group of boys tried to rape Y. R.  The grandmother found it   "remarkable" that "this did not seem to bother [Y. R.]" (R. at 375).  Approximately two weeks after this incident, Y. R. and her sister attempted to pull down the pants of a boy at school. Id.  In addition, the grandmother reported that [Y. R.'s] moods were "up and down."  According to the grandmother, Y. R. can either appear sad and depressed or then become too active.  She can become violent, and doesn't know "safety."  [Y. R.] has gotten into cars with adult men when requested to do so.  She has also threatened to jump off the roof when she gets tired of people telling her what to do.  She is "lying and sneaky."  She has stolen CDs out of automobiles (R. at 375).

At the time of her admission to the Parsons Child and Family Center November 2002, a Comprehensive Admission Report and Psychosocial Assessment was completed.  Y. R. was diagnosed with:

> …symptoms of Reactive Attachment Disorder (including an inability to respond appropriately to affection, an inability to fully participate in social interactions, hyper-vigilance, an inability to attend well to school and home tasks, and ambivalent/contradictory responses to her primary caregiver), symptoms of post-traumatic stress disorder (including hyper-vigilance, nightmares, impaired memory, restricted affect, irritability, and difficulty concentrating), and symptoms of unresolved grief and loss relating to her mother's abandonment (R. at 383).

Y. R.'s discharge criteria and plan required her to demonstrate:

> …a marked improvement in impulse control (as evidenced by a significant reduction in disruptive behaviors, an increase in her ability to follow rules and directives long-term, and an increase in her ability to attend to school and home tasks) and a decrease in unsafe behaviors (such as leaving the home without permission or sexually inappropriate behaviors), to age-appropriate expectations.  [Y. R.] will be able to express her feelings appropriately and cope with the memories of her abuse and neglect (within age-appropriate expectations) (R. at 373).

Sadly, in May 2003, Y. R.'s clinical social worker reported little progress in her treatment, and had encouraged Y. R.'s grandmother to "place [Y. R.] on a PINS/Ungovernable petition" for Y. R.'s safety (R. at 387).  The clinical social worker noted, "it will provide a doorway to a higher level of placement should [Y. R.] continue to be disruptive and unable to follow safety rules, which it appears likely at this point."  Id.

When considering the record in this matter in its totality, the Court finds Y. R. has marked limitations in the domains of "interacting and relating with others," and "caring for [oneself]."

18.    For the foregoing reasons, the Court finds that the ALJ's decision is erroneous and must be reversed.  Further, it would serve no purpose to remand this matter to the Commissioner for additional administrative proceedings other than to delay a fair and equitable outcome for Plaintiff and her granddaughter, Y. R.  Plaintiff has provided persuasive evidence that Y. R. has marked limitations in 2 of the 6 domains of functioning.  See 42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.926a.  Y. R. is therefore disabled under the Act and entitled to SSI benefits. Accordingly, the Court reverses the Defendant's decision and remands this case for calculation of benefits.

IT IS HEREBY ORDERED, that Defendant's Motions for Judgment on the Pleadings and Remand are

DENIED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is GRANTED.

FURTHER, this case is remanded to Defendant for calculation of benefits.

FURTHER, that the Clerk of the Court is directed to close this case.


SO ORDERED.


_____
Victor E. Bianchini
United States Magistrate Judge

Dated:  December 12, 2007
         Syracuse, New York